

The following constitutes
the order of the court. Signed May 10, 2016

_____

**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 14-43584 CN |
| TONY TISCARENO, | Chapter 7 |
|        Debtor. | |
| | |
| KIM BASS, KRISTY GRAHAM AND JON ZIMMERMAN, | Adversary No. 14-4178 |
|        Plaintiffs, | **MEMORANDUM DECISION AFTER TRIAL** |
| vs. | |
| TONY TISCARENO, | |
|        Defendant. | |

On February 23 and 24, 2016, this court conducted a trial in the above adversary proceeding. While the plaintiffs were represented by counsel, the defendant represented himself. Plaintiffs Kim Bass, Kristy Graham and Jon Zimmerman (collectively, "Plaintiffs") seek to deny Chapter 7 debtor and defendant Tony Tiscareno his Chapter 7 discharge, and obtain on their individual behalf non-dischargeable judgments primarily arising out of Tiscareno's conduct in the parties' multi-faceted pre-petition litigation. The following constitutes this court's findings of fact and conclusions of law under F.R.B.P. 7052.

This dispute, which has resulted in several years of District Court, Superior Court, and now Bankruptcy Court litigation, has its origins in a movie screenplay. Tiscareno is a general contractor/painter by trade and an aspiring screenplay writer at heart. None of his screenplays have

1

Case: 14-04178     Doc# 74     Filed: 05/10/16     Entered: 05/11/16 17:19:11     Page 1 of 26

been developed into a movie. In the 1990s, Tiscareno penned a screenplay entitled "FastGlass," an action thriller involving "kit" airplanes. Tiscareno registered his initial draft of FastGlass with the United States Copyright office in 1998, and his attempts to produce or market the screenplay were not successful. Plaintiff Kim Bass is a professional screenwriter, producer and director. He has written screenplays for "direct to video" movies, several of which he also has directed, and has enjoyed a career in television. In the early 2000s, Bass, who is a pilot, met David Riggs, a fellow pilot, and, unbeknownst to Bass, a three time felon and all-around fraud. Bass teamed with Riggs to produce several commercials, and they eventually agreed to make three low budget movies. Bass agreed to write and direct these movies, the first of which was initially titled "Fast Glass." Bass wrote and copyrighted the Fast Glass screenplay, which was an action thriller involving "kit airplanes" and the drug trade.[1] Afterburner, Inc., a company owned by Riggs, solicited investors for these movies and acted as the producer. Plaintiff Jon Zimmerman was one of the investors in this movie troika. The budget for all three movies was three million dollars.

Midway through the Fast Glass production, two investors contacted Bass and asked why the movie was over budget. Bass was not over budget. Instead, Bass and the investors learned to their chagrin that Riggs had embezzled approximately two million dollars from Afterburner, Inc. Not surprisingly, litigation ensued in Los Angeles County Superior Court in 2008, engulfing, among others, Zimmerman and his fellow investors as plaintiffs, and Riggs, Bass, and Afterburner, Inc. as defendants (the "Zimmerman Litigation"). Despite this litigation, Bass completed the movie (after purchasing Rigg's rights to the movie from his bankruptcy estate), and eventually sought domestic and international distributors for it.

This court is uncertain regarding when Tiscareno met Riggs, and how Riggs learned that Tiscareno has written his FastGlass screenplay. Regardless, Riggs provided him with a copy of the Zimmerman Litigation complaint and the addresses of the investors, and encouraged him to 1) claim that Bass's screenplay plagiarized his work and 2) intervene in the Zimmerman Litigation. Riggs's

---

[1] The Fast Glass screenplay was actually owned by Bass Entertainment, which Bass wholly owned and controlled. For purposes of this decision, this court will treat Bass Entertainment and Bass as one.

DECISION

motivation was clear, since Tiscareno's claims possibly would lessen the attention on the embezzlement claims. Tiscareno willingly took the bait, and on September 25, 2008, Tiscareno, using stationary in the name of "Power Curve International Productions," sent letters to the investors in which he informed them that Bass had stolen his screenplay and that it was his "intention to determine if any of the investors acted in a complicitious manner with foreknowledge of these facts." The September 25th letter also accused Zimmerman of conspiring with Bass to steal the "film print and other elements to Fast Glass, with the intent to re-release it under the fraudulent title: Going Vertical[2]." Tiscareno ended the letter by asking Zimmerman to contact him within ten days to "discuss your involvement in this matter."

The investors rejected Tiscareno's September 25th letter, and on December 2, 2008 Tiscareno filed an initial and then an amended (pro se) complaint in intervention against Bass, Zimmerman and the other investors in the Zimmerman Litigation. Tiscareno's attempt to intervene in the Zimmerman Litigation led to a litany of sanctions awards against him. After the Los Angeles County Superior Court granted the investors's motions to strike his complaints in intervention, it sanctioned Tiscareno $3200 due to his refusal to withdraw the amended complaint in intervention. The Los Angeles County Superior Court's June 8, 2010 order, which imposed these sanctions under California Code of Civil Procedure 128.7, states, in pertinent part, that:

> "The motion for sanctions is granted for the factual and legal reasons stated in the motion. Tiscareno filed his first amended complaint in intervention without first seeking court permission pursuant to Code of Civil Procedure § 387(a) and it was filed for the improper purpose of harassing the moving parties and needlessly increasing their litigation expenses. Tiscareno received sufficient warning that his first amended complaint in intervention was filed without the required court permission. Tiscareno was served by mail on October 19, 2009, with the proposed motion for sanctions. Even though the "safe harbor" period expired November 16, 2009 . . . Tiscareno did **not** withdraw his first amended complaint in intervention. On November 19, 2009, this court struck Tiscareno's first amended complaint pursuant to a noticed motion. Pursuant to Code of Civil Procedure § 128.7, Tiscareno shall pay a $3200.00 sanction to Jon Zimmerman, Robert Zimmerman, Kevin Heard and Richard Mattern for the attorneys fees they incurred as explained in the motion."[3]

---

[2] In or around October 2008, Bass changed the name of the movie to "Kill Speed."

[3] The sanctions motion was not introduced as an exhibit during trial. The Superior Court heard this sanctions motion on February 19, 2010.

3

Tiscareno's motion to reconsider the June 8, 2010 sanctions order was denied and led to the imposition of an additional $4500 in sanctions against him under CCP § 128.7. The Superior Court held in this sanctions order that "Tiscareno's motion for reconsideration was filed for the improper purpose of harassing the moving parties and needlessly increasing their litigation expenses."

Tiscareno unsuccessfully appealed both sanctions orders. The Court of Appeal, Second Appellate Department's unpublished decision (issued on July 6, 2011) which affirmed both sanctions awards provides a detailed history of Tiscareno's attempts to intervene in the Zimmerman Litigation, and his rationale for filing the amended intervention complaint. The Court of Appeal noted that:

> "Tiscareno's opening brief offers no excuse for his failure to seek or obtain the required leave of court to intervene. Moreover, the justification Tiscareno offers for his failure to withdraw his improper pleading, after having been alerted to its impropriety and the possibility of sanctions, affirmatively confirms the trial court's determination that sanctions should be imposed. Ignoring the patent impropriety of his pleading, Tiscareno explains that he refused to withdraw the improper pleading in the face of the proposed motion for sanctions because to do so would have required him to accede to the Zimmerman parties' demand that he comply with section 387. He is correct that the proposed sanctions motion sought to pressure him to withdraw his first amended complaint in intervention; what he failed — and still fails — to recognize is that its aim was legally appropriate, and indeed, was exactly what section 128.7 was designed to accomplish: withdrawal of the improper pleading.
>
> Tiscareno decries the possibility that a pro. per. litigant "with a proper cause of action" will be afraid to bring his case to court, intimidated by the fear of sanctions. The safe harbor provision of section 128.7, however is carefully designed to meet this precise threat. By providing litigants with a clear warning, in the form of a proposed motion for sanctions, showing the exact manner in which it will be argued that their pleadings *are not* a "proper cause of action," section 128.7 affords litigants an opportunity to withdraw defective pleadings without sanction. Only litigants who *do not* have a "proper cause of action" – and who refuse to heed the warning that their conduct is sanctionable – face the threat of sanctions." [footnote omitted.]
>
> In a footnote, the Court of Appeal also noted that:
>
> "Tiscareno argues that "Judge Solner [the Los Angeles County Superior Court trial judge] could have directed him on November 19, 2009 to Federal Court, in *Sua Sponte*, instead of continuing his struggle to intervene in the Superior Court action. This would have saved much time and expense for all ...," – thus suggesting that the court should then have barred him from seeking permission to intervene in the state court proceedings. His argument, though misplaced, reaffirms the obvious: His delay in filing in federal court, the sanctions imposed on him by the trial court in this case, and the delay and expense resulting from this appeal, all stem from his own failure to obtain and to follow competent legal advice – a failure that cannot be blamed on the trial court."

Tiscareno's petition for a rehearing before the Court of Appeal was denied, and the California Supreme Court denied his petition for review by order dated September 21, 2011.

4

DECISION

Eric Norwitz, an experienced Los Angeles attorney, represented several of the Zimmerman Litigation plaintiffs who obtained the sanction awards against Tiscareno. Tiscareno's feelings towards Norwitz were nothing short of contemptuous. Without the buffer of counsel, who would have explained to Tiscareno that Norwitz was zealously and ethically representing his clients, Tiscareno took Norwitz's conduct as a personal affront. On November 10, 2011, Tiscareno filed a complaint in Contra Costa County Superior Court which asserted causes of action for defamation and intentional infliction of emotional distress against Norwitz. Norwitz promptly requested that Tiscareno either dismiss the complaint or agree to transfer the litigation to Los Angeles County Superior Court. Tiscareno did neither. Norwitz thereafter obtained a Contra Costa Court order transferring the case to Los Angeles County Superior Court. The March 2, 2012 transfer order also imposed $6,485.00 in sanctions against Tiscareno, finding that "(1) an offer to stipulate to change of venue was reasonably made by Norwitz and unreasonably rejected by Tiscareno and (2) Tiscareno's selection of venue was made in bad faith given the facts and law that Tiscareno knew or should have known and given the lengthy history of conflict between the parties." Tiscareno unsuccessfully sought reconsideration of the order transferring the case to Los Angeles.

In June 2012, Norwitz recorded three abstracts of judgment in Contra Costa County (where Tiscareno resided) in an attempt to enforce the Zimmerman Litigation sanction awards.

Tiscareno also turned to the federal court to protect his FastGlass screenplay. On January 21, 2010, Tiscareno filed a copyright infringement action in the United States District Court for the Central District of California against several parties, including Bass and Zimmerman. Tiscareno initially asserted copyright infringement, intentional interference with economic relationship, and conspiracy claims for relief (the "2010 Copyright Action"). After a wave of motions to dismiss, only his copyright infringement claim against Bass survived.

The District Court scheduled a two day trial in mid-May 2011. On May 11, 2011, Tiscareno moved to dismiss his complaint, which was granted, without prejudice, by order dated June 23, 2011. Tiscareno's reason for dismissing the 2010 Copyright Action was that it was too burdensome to travel from Northern California to litigate his claims. Tiscareno's stated reason is dramatically at odds with his intense disdain for Bass and Norwitz and driving need to vindicate his screen writing

5

skills. Tiscareno's motive for pursuing the 2010 Copyright Action is plainly expressed in his email exchanges with defense counsel. Tiscareno believed that Bass plagiarized his FastGlass screenplay, and he intended to do everything in his power to protect his work. For example, in Tiscareno's October 7, 2010 email to Mark Koorenny (who represented several defendants in the 2010 Copyright Action), Tiscareno informs him that several screen writing experts will corroborate his plagiarism claim, and that his:

> "ego is not at play here. No one . . . has created a story that went into the kit plane world structured within a action thriller before me. In all humility, Bass isn't anywhere within my league of creativity. I did the initial design work for my own jet-powered kit plane JUST BEFORE THE MOVIE. . . . In regard to my screen writing skills, they are excellent. It was painful to go back and read my early work. I suffered from the typical ACT II syndrome which most writers mess up with. But, I am a very well trained writer. I know the system and can teach it. But for right now, it is my novel that I looked to finish. And then go and rework the screenplay, which the way it would work is that the Hollywood dumb-dumbs would say, "Why didn't you try to sell your script?" I know how people are. You can only shake your head and go on in the environment. But Mark, egos aside, you should suggest a settlement with your clients, because I am totally gearing for trial. . . . But I am surprised at your clients. Who in their right mind would spend nearly a million dollars on legal fees, on a three million dollar movie, that is now only worth about half a million to maybe more than one million. It's not shrewd sir, or even reasonable. I understand how things can get out of hand when human are involved. But it's time to get a grip."

Tiscareno's November 16, 2010 email is even more blunt. Here, he informs Koorenny that:

"I know that Bass's career was resurrected by Dave Riggs. Bass has been a shutout with Hollywood ever since he plagiarized Johnny Burt. The facts don't lie. . . . I realize that you all thought that I was a stupid pro se that could be easily sent home with my tail between my legs. Well . . . NO! . . . I know that Bass's career was resurrected by Dave Riggs. Bass been a shutout with Hollywood ever since he plagiarized Johnny Burt. The facts don't lie. ... You see I am trying to fathom the logic of spending around a million dollars in legal fees for a movie that cost three million to make, but is only worth half that, if that. It doesn't make sense, sir. If I wasn't so deep into my novel, which was and/or IS my ticket to move my FASTGLASS screenplay into the front of Hollywood's attention, I might have let this go. If you were to look at my titles and Bass's film titles, his are usually ghetto, drug world titles. It's unlikely he could ever come up with taking obscure term of fast glass and making a noun out of it, as I did. I am trying to get you to see my point in all of this. I don't enjoy conflict , but it's my creation, sir, and your clients instead of doing the decent thing and at least ask for proof from me, have either ignored me, or kicked me to the curb in their minds. I am nothing to them. I must naturally take exception to that notion. I am someone. And they are profiting, though minorly, nonetheless off of my creation. I can't allow that. Your clients and your people have devalued me as a person, and have devalued my Copyrighted work, now a dozen years ago this December 4th. I have played by the rules and did what I was suppose to, and look what I get for my efforts. . . .What I propose is that if you want to clear Mr. Gaalanti, given these facts, as he is probably the least culpable, I suggest a reasonable settlement with him. . . . He could have done much to resolve some of this. But, I have to look at him as someone who could care less about me, or my work,

Case: 14-04178    Doc# 74    Filed: 05/10/16    Entered: 05/11/16 17:19:11    Page 6 of 26

1    Copyrighted or not, my loss, and kick me to the curb.  So be it."

2    Tiscareno also sought to undermine the Kill Speed movie through extra-judicial means.  In

3    2010, Bass sought to find foreign distributors for Kill Speed (and a second movie, called the

4    "Junkyard Dog") at the 2010 American Film Market.  Tiscareno directly participated in efforts to

5    hire a rolling billboard (and individual picketers, who handed out flyers) which warned AFM

6    attendees that Kill Speed was "stolen property."  Tiscareno also directly participated in the creation

7    of a website called "filmtheft.com" sponsored by a bogus entity called the "Motion Picture Piracy

8    Association." The rolling billboard truck and flyers directed people to the filmtheft.com website

9    (which apparently was created in conjunction with the opening of the 2010 American Film Market).

10   The website contained Kim Bass's picture and statements (including snippets from pleadings in the

11   Zimmerman Litigation and 2010 Copyright Action) which, *inter alia*, accused Bass of plagiarism,

12   misstated the bankruptcy court process through which Bass obtained Rigg's rights to the Kill Speed

13   movie from Rigg's Chapter 7 bankruptcy estate, and less than accurately described the status of the

14   2010 Copyright Action.  The filmtheft.com website also contained a video in which Tiscareno

15   prominently appeared, stating, *inter alia*, that "they" "changed the names and now they're trying to

16   sell it as . . . their own property," and "Don't buy it, it's stolen."  These statements referred to the

17   Kill Speed movie[4]. The "Motion Picture Piracy Association" also "revealed" that Bass had

18   previously been accused of stealing the idea behind the "Sister-Sister" televison show from John

19   Burt. The website stated that Burt filed a multi-million dollar lawsuit against Bass, and that the

20   parties had settled after six years.  The website also stated that "In a sworn statement filed in Los

21   Angeles Superior Court dated October 2009, Mr. Burt states that "Bass committed wholesale theft

22   and the only work he ever sold to Paramount was the work he stole from me."

23   Tiscareno was not content, however, with simply calling Bass a plagiarist and a thief.  On

24   August 4, 2010,Tiscareno sent an email to the Afterburner investors and potential distributors of Kill

25   Speed in Asia and Europe and attached to it a 2001 Los Angeles County Superior Court child

26

27   _____

      [4] Bass sought to introduce and play for the court a cd version of the video.  The cd would not
28   play, and Bass testified to the video's contents.

DECISION

1    support judgment entered against a "Kim Bass" for a daughter born in 1987.  Tiscareno made no

2    effort to determine if this "Kim Bass" was his "Kim Bass."  At trial, Bass testified that he was not a

3    party to this family court litigation, had never fathered a daughter, and did not know about this

4    family court order until Tiscareno circulated it.   Bass did testify, however, that this email

5    significantly affected his efforts to distribute Kill Speed in Japan.

6              Tiscareno's email also attached an alleged declaration from John Edward Burt, signed on

7    October 25, 2009, in which Burt a) accused Bass of stealing the "Sister-Sister" concept from him,

8    and b) detailed the alleged facts behind Burt's litigation against Bass and various production

9    companies regarding this alleged theft of idea.  Paragraph 8 of his declaration states that:

10             "There is no doubt that Mr. Bass committed a wholesale theft of my idea and
         plagiarized my treatment.  I later learned during the discovery process which took
11       place as a part of the litigation that Mr. Bass was unable to turn in a single full script
         for Sister-Sister which was acceptable to Disney-Paramount Television. In fact Mr.
12       Bass was only given a "Created By" credit which was a part of a settlement with
         Paramount Television. The only work Mr. Bass was ever able to sell to Paramount-
13       Disney for the Sister-Sister production was the work he had stolen from me."[5]

14             Bass testified at trial in this adversary proceeding how he developed the "Sister-Sister"

15   concept and how it reached the screen.  His testimony demonstrated that he was the sole source of

16   the "Sister-Sister" concept, and that Burt had nothing to do with it.

17             The dismissal of the 2010 Copyright Action did not deter Tiscareno from pursuing his

18   copyright claims.   In April and July of 2012, Tiscareno sent letters to Lionsgate Entertainment and

19   Netflix, respectively (who he believed had acquired the Kill Speed distribution rights), informing

20   them that Bass was a serial plagiarist who stole his screenplay.  The letters state, in part, that:

21             "In January 2010, I filed a Copyright Infringement suit against the previous distributor
         Epic Pictures and the plagiarist, Mr. Kim Bass, in U.S. District Court. . . . In May
22       2011, I dismissed the case Without Prejudice, as it became obvious that neither Mr.
         Bass, nor Epic had any substantial assets from which to recover damages.  However,
23       if Lionsgate intends to facilitate the exploitation of this movie, whose script was so
         blatantly stolen from me.  I will not hesitate to re-file the action naming Lionsgate, as
24       well as the other responsible parties. . . . . Finally, you may be interested to know that
         Mr. Kim Bass, the purported "writer" of KILL SPEED/FAST GLASS, has been
25       previously sued in 1997, after his claim to have created the TV show: "Sister-Sister."
         That case was brought in federal Court by John Edward Burt was settled at great cost
26       to Paramount Studios.  A copy of that suit can be made available to you, if you are not

27   _____

28       [5]  Tiscareno testified at trial that Riggs introduced him to Burt.

                                                    8

already aware of it. If you would like to enter into discussions concerning payment for my rights to this property, I would welcome it."

After Netflix and Lionsgate declined to respond to his letters, Tiscareno commenced a copyright infringement action in the United States District Court for the Northern District of California on July 23, 2012 (the "2012 Copyright Action"), which asserted copyright claims against Netflix, Blockbuster, Inc., Bass and Norwitz. The 2012 Copyright Action also asserted a copyright claim against plaintiff Kristy Graham. Graham, an amateur journalist and aviation enthusiast, maintained a website called "Aviationcriminal.com." In 2011, Graham began posting articles detailing Riggs' criminal activities and his involvement with the Kill Speed movie. Her July 1, 2012 on-line article discussed the tortured history of the film and provided a favorable review of the movie. On July 2, 2012, Tiscareno sent Graham a "Notice of Copyright Violation Re: Kill Speed," which demanded that she "cease and desist publishing any images or copyrighted intellectual property which belongs to me. You should construe this letter as formal notification under the Digital Millennium Copyrigth [sic] Act (DMCA)." Tiscareno named Graham as a defendant when she failed to comply with his request to takedown her website.[6] On August 13, 2012, Tiscareno filed a first amended complaint in the 2012 Copyright Action, which omitted (and therefore dismissed) Bass.[7]

Tiscareno claimed in the 2012 Copyright Action that Netflix and Blockbuster infringed on his FastGlass copyright by selling and promoting the Kill Speed movie. Netflix was a licencee and Blockbuster was the retailer of the movie. Tiscareno further alleged that Graham and Norwitz conspired with Netflix and Blockbuster to promote, exploit, and distribute Kill Speed.

Tiscareno employed an unyielding litigation strategy in the 2012 Copyright Action that was designed to inflict as much financial pain (in the form of attorney's fees) as possible. He filed the 2012 Copyright Action in the Northern District of California, which required the defendants to file a

---

[6] Tiscareno sent a second, related demand letter to Graham on July 6, 2012.

[7] While Tiscareno's first amended complaint described Bass as being judgment proof, the court presumes that Tiscareno dismissed him due to his failure to pursue him to judgment in the 2010 Copyright Action.

9

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

motion for a change of venue to the Central District of California.  He unsuccessfully appealed District Court Judge Hamilton's change of venue order, routinely refused to respond to meet and confer requests, and did not cooperate in coordinating discovery.  His attitude towards this litigation and the defendants was presaged in an April 17, 2012 email to Koorenny that Tiscarento wrote during his Superior Court defamation action against Norwitz.

> "I must tell you that this whole mess could have been resolved years ago.  I don't doubt that secretly [you] all know that Bass plagiarized me, but you were all deeply invested in the project. What you failed to understand is that David Riggs had convinced me to settle for some cash and a writing credit. This was still about two months before any of you knew who I was.  And how was I treated?  With a slam to the face.  And, outside of your lawyers, what do you any of us have to show for it?  I would say, little to none.  All I can say on my part is that I was instrumental in destroying the value of the film and caused the courts and the east coast investors a lot of money.  Personally that does not impress me. I tried to be amiable about it, though I was reeling inside over my work being taken from me like it was.  Right now, I have 265,000 plus words on my novel.  That's all I have left of this ordeal.  My novel.  I would think you agree that a man has a right to his work."

On June 5, 2013, Tiscareno moved to dismiss Graham from the 2012 Copyright Action on the ground that "while defendant Graham promoted the film: "KillSpeed" notwithstanding being warned (DMCA) it would promote a more stream-lined and shortened trial-saving the court and all parties time and expense."  He further noted that "Plaintiff sees no reason why dismissal should not be granted.  Plaintiff feels Defendant Graham has learned her lesson regarding infringing on other's intellectual property, even in a minor way." Graham did not consent to the motion, and the defendants filed a joint summary judgment motion in November 2013, which was granted on March 6, 2014.  In its memorandum decision, the District Court determined as a matter of law that Tiscareno's FastGlass screenplay and the Kill Speed screenplay and movie were not substantially similar, and that the defendants were not liable for secondary copyright infringement. Graham, Netflix, Blockbuster and Norwitz promptly thereafter filed a motion for attorney's fees.  The District Court partially granted the attorney's fees request, awarding $49,632.00 to Graham (who was represented by Norwitz), and $9,601.34 each to Netflix, Blockbuster and Norwitz.

The District Court awarded fees under the Copyright Act of 1976, which authorizes a court to award reasonable attorney's fees to the prevailing party. *See* 17 U.S.C. § 505.  In awarding these fees, the District Court considered

**DECISION**

"the following factors: (1) the defendant's degree of success obtained on the claim, (2) the frivolousness of the plaintiff's claim, (3) the objective reasonableness of the plaintiff's factual and legal arguments, (4) the plaintiff's motivation in bringing the lawsuit, and (5) the need for compensation and deterrence." [citations omitted.] With regard to the second element, the District Court determined that "[P]ro se plaintiffs cannot simply be assumed to have the same ability as a plaintiff represented by counsel to recognize the objective merit (or lack of merit) of a claim. Thus, although summary judgment was granted, the Court cannot conclude that Tiscareno knowingly brought a frivolous lawsuit. However, the Ninth Circuit has held that when determining whether to award attorney's fees, 'a finding of bad faith, frivolous or vexatious conduct is no longer required.' The Court finds that this factor is neutral. [citations omitted.]"

The District Court also made a "neutral" determination regarding Tiscareno's motivation.

"Under the fourth factor, the Court determines whether Tiscareno demonstrated a bad faith motivation in litigating the case. Defendants argue that 'this action was the latest attempt by Tiscareno . . . to destroy Bass' reputation as a screenwriter and director, severely damage the marketability of the Kill Speed film, and force Graham to remove her Aviation Criminal website.' Defendants also assert that '[o]f all the Defendants, Tiscareno knew Graham did not have the financial resources to pay an attorney to defend her from his claim.' Defendants note that '[a]lthough Tiscareno admitted to Graham in a cease and desist letter that [Graham] was engaged in jounalism, Tiscareno alleged Graham infringed on FASTGLASS by posting her news article and by conspiring with Norwitz, Netflix, and Blockbuster. Defendants conclude that 'Tiscareno's improper motives regarding all the Defendants warrant an award of attorney's fees.' However, because Tiscareno is a *pro se* litigant and because there is no clear evidence of bad faith conduct, this factor is neutral."

The Court did find, however that the 2012 Copyright Action was "objectively unreasonable."

Tiscareno filed his Chapter 7 bankruptcy on August 29, 2014. His Chapter 7 petition and bankruptcy schedules contained several omissions and misrepresentations. First, Tiscareno's bankruptcy petition did not list his dba "Power Curve Productions," the name under which Tiscareno wrote his September 2008 letters to Zimmerman and his fellow Afterburner investors. Second, Tiscareno's bankruptcy schedule B misrepresented the status of his FastGlass novel. His schedule B described his work as an unnamed "Novel **Idea only, not yet written or published," with "Unknown" value. In fact, Tiscareno had informed Koreenny in an email that he was more than a quarter million words into the FastGlass novel. Tiscareno highly valued his FastGlass work, and the language used on his Schedule B was a poorly disguised effort to prevent the Chapter 7 trustee from, ironically, evaluating it. Tiscareno also misrepresented his ownership of his residence on his schedule A. Tiscareno listed a $20,000 fee simple interest in a "Double Wide Home" in Bay Point, California, which he fully exempted on his schedule C. In fact, Tiscareno signed a Bill of Sale

11

transferring title to his brother, Tim Tiscareno, on October 20, 2013. This transfer is also reflected on a registration card issued on March 24, 2014 by the State of California's Department of Housing and Community Development which stated that Tim Tiscareno was the registered owner of the double wide. Tiscareno explained in a declaration filed in response to the Chapter 7 trustee's objection to his exemption that in October 2013 he could no longer afford his mortgage payments, and that he transferred the residence after his brother paid $12,000 to satisfy the loan against the double wide. Tiscareno also transferred title to protect his residence from his wife, who had left Tiscareno.[8] Tiscareno's declaration stated that "In January 2014, my wife emailed me that she had moved on. It was soon thereafter that my brother pushed me to do a proper legal transfer of the home into his name, until after I filed for divorce and the divorce was final. Come the summer, he kept pushing me to file for divorce and file for bankruptcy and begin anew. I filed for both in September 2014." Tiscareno also stated that his wife "agreed to give me full ownership of the mobile home, for $2,000, which my brother paid additionally." Tiscareno continued to live in the Bay Point property, and he did not disclose its transfer on his statement of financial affairs.

Finally, Tiscareno, who was a self-employed painter and general contractor, did not maintain a bank account in his own name. Instead, Tiscareno listed a Wells Fargo Bank account on his schedule B that was in his daughter's name. Tiscareno stated on his schedule B that he "occasionally deposits into this account." Tiscareno testified that he used his daughter's account to "avoid the prying eyes" of his wife. Tiscareno indicated on his statement of financial affairs that he closed his own Wells Fargo account in March/April 2014.

### The Section 727 Claims For Relief

Plaintiffs seek to deny Tiscareno his Chapter 7 discharge under several subsections of Bankruptcy Code § 727(a). Some of their claims have merit.

Under Bankruptcy Code § 727(a)(4), this court may deny a Chapter 7 debtor's discharge if the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or

---

[8] Tiscareno's Statement of Financial Affairs states that he and wife separated on November 16, 2012.

1   account. Plaintiffs must demonstrate by a preponderance of the evidence that (1) the debtor made a

2   false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made

3   knowingly; and (4) the oath was made fraudulently. *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010)

4   (*citing Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005). "Objections to

5   discharge under 11 U.S.C. § 727 are to be literally and strictly construed against the creditor and

6   liberally in favor of the debtor." *In re Coombs*, 193 B.R. 557, 560 (Bankr. S.D. Cal. 1996) (*quoting*

7   *In re Bodenstein*, 168 B.R. 23, 27 (Bankr.E.D.N.Y.1994)).

8           Bankruptcy Code § 727(a) is designed "to insure that the trustee and creditors have accurate

9   information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills*

10  *(In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999) (*citing Aubrey v. Thomas (In re Aubrey)*, 111 B.R.

11  268, 274 (9th Cir. BAP 1990)); *see also, Searles v. Riley (In re Searles)*, 317 B.R. 368, 378 (9th Cir.

12  BAP 2004) ("The continuing nature of the duty to assure accurate schedules of assets is fundamental

13  because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete

14  disclosure by debtors of their financial affairs."). Although § 727 claims are narrowly construed in

15  the debtor's favor, a debtor who secretes assets must surmount the stain of unclean hands to benefit

16  from this favorable statutory construction. *Beauchamp*, 236 B.R. at 732. "[T]he very purpose of

17  certain sections of the law, like 11 U.S.C. § 727(a)[ ], is to make certain that those who seek the

18  shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their

19  affairs.") *Id*. (citations omitted).

20          Errors and omissions from a debtor's bankruptcy schedules and statements can constitute

21  false oaths under §727(a)(4). *Retz*, 606 F.3d at 1197; *Searles*, 317 B.R. at 377; *Roberts*, 331 B.R. at

22  882. *See, e.g.,* 28 U.S.C. § 1746; Fed. R. Bankr.P. 1008. Tiscareno's bankruptcy schedules and

23  statement of financial affairs contained several errors and omissions. Tiscareno did not disclose the

24  transfer of his Bay Point residence to his brother, and he wrongfully claimed a fee interest in it on his

25  schedule A in order to assert an exemption against it on his schedule C. He also inaccurately

26  described the status of his FastGlass novel. The question before this court is whether these

27  misstatements are sufficient to deny Tiscareno his Chapter 7 discharge under § 727(a)(4).

28          Tiscareno knowingly and fraudulently misstated his interest in his residence and the status of

---

13

his FastGlass novel. A debtor must act "knowingly" when making a false oath. *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A). "A debtor 'acts knowingly if he or she acts deliberately and consciously." (*In re Retz*, 606 F.3d at 1198 (*quoting In re Khalil*, 379 B.R. at 173); Black's Law Dictionary 888 (8th ed. 2004). When he filed his Chapter 7 case, Tiscareno knew that his FastGlass novel was well underway, and that he no longer held title to his Bay Point residence. There is also little question that Tiscareno acted fraudulently. To demonstrate fraudulent intent under §727(a)(4), Plaintiffs must establish that Tiscareno made the representations or omissions at issue, knew they were false when they made them, and made them with the intention and purpose of deceiving the creditors. *In re Retz,* 606 F.3d at 1198-1999; *Khalil*, 379 B.R. at 173. Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir.1985). Tiscareno knew that his bankruptcy schedules and statement of financial affairs incorrectly described his interest in his residence and novel, and he did so to protect these assets from the Chapter 7 trustee and his creditors.

Only Tiscareno's misstatement regarding his Bay Point residence, however, was material. A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *In re Khalil*, 379 B.R. 163, 173 (9th Cir. BAP 2007) (citations omitted). An omission or misstatement that "detrimentally affects administration of the estate" is material. *In re Wills*, 243 B.R. at 63 (*citing* 6 Lawrence P. King et al., Collier on Bankruptcy ¶ 727.04[1][b] (15th ed. rev.1998)).

Tiscareno's false oaths regarding his Bay Point residence were made to prevent the Chapter 7 Trustee from investigating the transfer of this property to Tiscareno's brother (which transfer -as further discussed below - constitutes an independent ground to deny his Chapter 7 discharge). His false assertion of a fee interest in the Bay Point residence forced the Chapter 7 trustee and his creditors to object to his exemptions and challenge his ownership of the residence. His asserted interest in the residence was the largest asset listed on his bankruptcy schedules. This misrepresentation was therefore material. This court cannot find, however, that his inaccurate

14

description of the FastGlass novel warrants the denial of his discharge. While Tiscareno highly prized his unfinished novel, the 2012 Copyright Action (and his failure to find a market for the screenplay) demonstrated that it had no commercial value. It would be high irony indeed, if this court found that work to be material after so much effort was spent demonstrating that it was not. Tiscareno's Chapter 7 discharge is therefore denied under § 727(a)(4) due to his wrongful ownership claim in the Bay Point property.

Tiscareno's Chapter 7 discharge is also denied under Bankruptcy Code § 727(a)(2). Bankruptcy Code § 727(a)(2) provides, in relevant part, that the bankruptcy court must deny a Chapter 7 discharge if, "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . (A) property of the debtor, within one year before the date of the filing of the petition" or "(B) property of the estate, after the date of the filing of the petition." The party objecting to discharge must demonstrate by a preponderance of the evidence "that [the debtor's] discharge should be denied." *In re Retz*, 606 f.3d 1189 (9th Cir. 2010) (citations omitted). The debtor's fraudulent intent must be actual, rather than constructive, and "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *In re Adeeb*, 787 F.2d 1339, 1342-43 (9th Cir.1986). The requisite fraudulent intent is typically established through the following factors: (1) the nature of the relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer. *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir.1992). Further, the statute requires only that the debtor make the transfer with intent to hinder, delay or defraud "a creditor." There is no requirement that the debtor intend to hinder all of his creditors. *In re Schafer*, 294 B.R. 126 (N.D. Cal. 2003).

Tiscareno's transfer of his Bay Point residence to his brother constituted such a transfer. Tiscareno transferred the residence to his brother with the intent to hinder, delay or defraud his wife in their soon to be filed dissolution action (Tiscareno filed the dissolution action on September 17,

15

2014). Tiscareno's bankruptcy schedules indicate that he was insolvent when he transferred the property to his brother in March 2014, and his residence (at least as valued on his bankruptcy schedules) was his most significant asset. While Tiscareno's brother indicated in his declaration that he paid $12,000 for the residence, this fact alone does not dissuade this court from finding that Tiscareno had the requisite fraudulent intent. Moreover, while Tiscareno states that his wife accepted $2,000 for her interest in the double wide, his declaration just as clearly states that he transferred the property to his brother to prevent her from asserting some rights to it in their dissolution action.

This court makes a similar finding regarding Tiscareno's use of his daughter's Wells Fargo bank account. Tiscareno's painting and general contractor work was his only source of income, which he deposited into his daughter's bank account in the months before he filed his Chapter 7. Tiscareno closed his own Wells Fargo account in March 2014, and he could not adequately explain why he closed his account, other than his avowed purpose to avoid his wife's prying eyes. This court concludes that Tiscareno used his daughter's account to fraudulently conceal his income from his wife. Accordingly, Tiscareno's discharge is denied under Bankruptcy Code § 727(a)(2).

## The Section 523 Claims For Relief

Plaintiffs also individually assert non-dischargeability claims for relief under Bankruptcy Code § 523(a)(6). Most of their claims arise from Tiscareno's litigation strategy in his state and federal court actions.

## The Zimmerman § 523(a)(6) Claim

Plaintiff Jon Zimmerman was one of the Afterburner investors and plaintiffs in the Zimmerman Litigation. Zimmerman asserts that the $12,456.26 in sanctions levied against Tiscareno under California Code of Civil Procedure § 128.7 due to his ill-fated attempt to intervene in the Zimmerman Litigation are non-dischargeable under Bankruptcy Code § 523(a)(6).

Bankruptcy Code § 523(a)(6) provides that claims for "willful and malicious injury by the debtor" cannot be discharged by a Chapter 7 debtor. Courts separately analyze the willful and malicious elements. A "willful" injury is a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. To satisfy this requirement, Zimmerman must demonstrate that

16

Tiscareno either had a subjective intent to harm or a subjective belief that harm is substantially certain. *Carrillo v.Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002). This court presumes that a debtor knows the natural consequences of his actions. *Ormsby v. First American Title Co. of Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).

A malicious injury involves "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Su*, 290 F.3d at 1146-57. Under this element, "it is the wrongful act that must be committed intentionally rather than the injury itself." *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005). Malice may be inferred based on the nature of the wrongful act." *Ormsby*, 591 F.3d at 1206.

California Code of Civil Procedure § 128.7 was modeled after Rule 11 of the Federal Rules of Civil Procedure, and cases construing Rule 11 are persuasive authority for interpreting its state law counterpart. *See Eichenbaum v. Alon*, 106 Cal.App.4th 967 (2003). Section 128.7 provides in pertinent part that:

> "(b) By presenting to the court . . . a pleading, petition, written notice of motion or other similar paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, all of the following conditions are met:
>
> (1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> (2) The claims, defenses, and other legal contentions therein are warranted by existing law or the establishment of new law.
>
> (3) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.
>
> (4) The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief."

If a party or attorney violates subsection (b), a court may impose sanctions sufficient to deter further such violations. *See* California Code of Civil Procedure § 128.7(d). Significantly, whether an action is frivolous under § 128.7 is measured by an objective standard. *Optimal Markets, Inc. v. Salant*, 221 Cal.App. 4th 912 (2013).

Standing alone, a §128.7 sanctions order is dischargeable. Section 523(a)(6) requires this court to determine a debtor's subjective intent, and, as stated above, § 128.7 sanctions are premised

willful.  Moreover, the findings of fact made by the Los Angeles County Superior Court and California Court of Appeal, which imposed the § 128.7 sanctions, parrot § 128.7's statutory language and do not establish the level of willful misconduct required by § 523(a)(6).

Plaintiffs are not, however, asking this court to determine the dischargeability of these sanctions by way of issue preclusion/collateral estoppel.  Instead, they ask this court to examine all of the evidence before it to determine the dischargeability of this debt.

The § 128.7 sanctions arise from the Zimmerman Litigation, which was the first of several pieces of Kill Speed litigation that Tiscareno either attempted to insert himself into or commenced on his own.  Tiscareno's unauthorized attempts to intervene were spurred on by David Riggs, who provided him with a copy of the Zimmerman Litigation complaint and the names and addresses of the Afterburner investors.  Tiscareno stubbornly and wrongfully ignored all of the Zimmerman Litigation plaintiffs' requests to a) dismiss his complaints in intervention and b) withdraw his various motions for reconsideration and appeals.  There is little doubt that he took some pleasure in the fact that his *pro se* presence required the Zimmerman Litigation plaintiffs to incur substantial attorneys fees.  Yet, Tiscareno's testimony established that his main goal in the Zimmerman Litigation was to force the parties to address his plagiarism/copyright claims against Bass. Tiscareno's testimony and emails indicate that he was willing to "walk away" from his plagiarism/copyright claims after these sanctions were issued against him, but that he changed his mind after Norwitz attempted to collect the sanctions awards (presumably when Norwitz recorded abstracts of judgment on each § 128.7 award in July 2012).

Tiscareno's sanctionable conduct occurred in a) 2009 - when he filed the amended complaint in intervention, leading to the $3200 sanctions award; b) 2010 - when he filed the motion to reconsider this sanctions award, leading to an additional $4500 in sanctions; and c) 2011 - when he filed his motion to amend the sanctions awards, leading to the final $4000 sanctions award. Zimmerman has not demonstrated by a preponderance of the evidence that when Tiscareno filed these pleadings, he had a subjective intent to injure Zimmerman or subjectively knew that harm was substantially certain.  Instead, there is substantial evidence that Tiscareno was primarily focused on

18

vindicating his screen writing credentials.

In addition, even if Zimmerman had met his burden of proof that Tiscareno acted willfully, he has not demonstrated what his actual claim is. The § 128.7 sanctions were jointly awarded to all of the Zimmerman Litigation plaintiffs: Zimmerman, Robert Zimmerman, Richard Mattern and Kevin Heard. Black's Law Dictionary defines the word joint (as an adjective) as "(Of a thing) common to or shared by two or more persons or entities." No evidence was introduced establishing what portion of these sanctions belonged to Zimmerman. Accordingly, Zimmerman has not established a non-dischargeable claim for relief under § 523(a)(6).

### The Graham § 523(a)(6) Claim

By mid 2012, Tiscareno's litigation efforts had accomplished nothing. His attempts to intervene in the Zimmerman Litigation had resulted in several sanctions awards against him, his defamation litigation claim against Norwitz resulted in further sanctions, and he dismissed the 2010 Copyright Action on the eve of trial, which, if it had proceeded, would have given him his long awaited opportunity to prove his plagiarism/copyright claims against Bass. Tiscareno's 2012 email exchanges with Koorenny demonstrated that he knew that his litigation strategy was "destroying the value of the film and causing the courts and the east coast investors a lot of money." While he had previously been willing to walk away from his plagiarism and copyright claims, Norwitz's collection efforts riled him and led him back to his self-destructive, litigious path. In July 2012, Tiscareno commenced the 2012 Copyright Action and named Graham as one of the defendants. In October 2012, Tiscareno offered to settle his claims against Graham if she agreed to shut down her AviationCriminal website. Graham refused, and in June 2013, Tiscareno moved to dismiss her from the 2012 Copyright Action, stating, among other things, that he believed that "Defendant Graham has learned her lesson regarding infringing on other's intellectual property, even in a minor way." Graham did not consent to the dismissal, and she and the other defendants successfully moved for summary judgment and obtained attorney's fee awards as the prevailing parties. The District Court awarded $49,632.00 in fees to Graham.

Graham contends that her fee award is non-dischargeable under Bankruptcy Code § 523(a)(6). This court, with some pause, holds otherwise. While Tiscareno's emails, settlement

19

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  demands, and motion to dismiss demonstrate a spiteful attitude towards Graham and anyone else

2  who gave the movie any credence or value, he pursued the 2012 Copyright Action with an eye

3  towards enforcing his FastGlass copyright.  He sought discovery and opposed the summary judgment

4  motion, and the summary judgment order was the adjudication (albeit not the result) that he had

5  always sought. Litigation involving a pro se party is often animated, heated, and full of inflammatory

6  language that does not have the benefit of a lawyer's fine tuning.  Litigation is frequently a "zero

7  sum game," where the plaintiff wants nothing more than to vindicate his rights and in the process rub

8  the defendant's nose in the dirt and inflict some financial pain.  This alone cannot mean that such a

9  party, who loses at summary judgment, should face § 523(a)(6) liability when he files a bankruptcy

10 to discharge the resulting attorney's fee award entered against him. Admittedly, there is more to this

11 adversary proceeding than that. Yet, none of the defendants in the 2012 Copyright Action had been

12 previously sued by Tiscareno, and his copyright claims had not been adjudicated before then. As a

13 result, this court cannot find that Graham has demonstrated "willfulness" by a preponderance of the

14 evidence.

15       This court does not, however, condone Tiscareno's litigation strategy. His conduct is the very

16 reason why the federal judiciary has imposed national and local rules which seek to temper the

17 litigation process.  Yet, for the reasons stated above, Tiscareno's conduct did not rise to the level of

18 non-dischargeable conduct.[9]

19                          **The Bass § 523(a)(6) Claim**

20       Finally, Bass asserts that Tiscareno defamed and damaged him, and that he therefore has a

21 non-dischargeable claim against him. Defamatory claims may be non-dischargeable under §

22 523(a)(6). *See Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101 (9th Cir. 2005).  In California, defamation

23 is defined as either libel or slander.  Cal. Civil Code § 44.  Libel is defined as a "false and

24 unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye,

25 which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be

26

27 _____

28       [9]  This court's determination was not swayed by the District Court's attorney's fees order,
   since the District Court used an objective standard when analyzing Tiscareno's claims.

**DECISION**

shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civil Code § 45.[10] Absent a privilege, a party who actively participates in the publication of a defamatory statement is liable for libel, and may be subject to special, general, and possibly punitive damages. *Di Giorgio v. Valley Labor Citizen,* (1968) 260 Cal.App.2d 268, 273. Tiscareno either wrote the allegedly defamatory statements or actively participated in their publication, and he thus is liable if they constitute libel.

**1. The E-Mail**

Tiscareno's August 4, 2010 email to the Afterburner investors and (potential) foreign distributors of Kill Speed was libelous. His email encouraged its recipients to read the two attachments, stating that he did not "want you to miss out on a single, most revealing document . . . ." Tiscareno attached the Los Angeles County Superior Court judgment for the sole purpose of demonstrating that "his" Kim Bass was not paying child support, and he attached the Burt statement to declare that Bass was a thief. Bass testified, however, that he did not father the daughter in question and therefore was not a child support derelict, and that the "Sister-Sister" concept was his and his alone. Tiscareno made no effort to determine whether the Kim Bass named in the Superior Court order was "his" Kim Bass, and he therefore had no reasonable grounds to believe that Kill Speed's Kim Bass was not paying his child support. He also did not investigate Burt's allegations.

Libel requires published statements which imply a provably false factual assertion. This determination is made by examining the:

> "totality of the circumstances . . . . First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. . . . [¶] Next, the context in which the statement was made must be considered . . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." [citations omitted]. *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1608.

As stated above, the email attachments contained provably false statements regarding Bass, and their defamatory interpretations were bluntly conveyed to their readers. Since the email was sent

---

[10] Tiscareno has the burden of demonstrating that his statements were privileged. *See Bikkina v. Mahadevan*, (2015),241Cal.App.4th 70, 89-90. He introduced no evidence nor made any legal argument on this issue, and he therefore has waived this defense.

**DECISION**

to the Kill Speed investors and potential distributors, the email had a tendency to professionally injure Bass (indeed, Bass testified that this email seriously affected his efforts to find a Japanese distributor for Kill Speed). These statements constituted not only libel, but libel on its face. California Civil Code § 45a provides in pertinent part that: "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as inducement, innuendo or other extrinsic fact, is said to be libel on its face."  Libel on its face does not require a plaintiff to prove special damages under Cal. Civil Code § 48. While a plaintiff who proves libel on its face may recover specific pecuniary losses caused by the false statement,

> "It is not necessary for the plaintiff to prove any specific harm to his reputation or any other loss caused thereby.  Indeed, in many cases the effect of the defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed. If the plaintiff is able to show a particular pecuniary loss resulting from the defamatory publication, he may recover for the special harm thus caused . . . .  If, however, he is unable to show such definite loss, but the defamatory publication is of such a kind and was published under such circumstances as to justify the inference of some general impairment of his reputation or through the loss of reputation, to his other interests, he is entitled to recover general damages therefor." *DiGiorgio Fruit Corp.*, *supra*, at 577.

While Bass testified that the defamatory email cost him several million dollars in movie distribution rights and other lost income, his testimony lacked foundation.  For example, Bass testified that he had a deal with a Japanese distributor for Kill Speed which was going to pay him a $100,000 advance.  These distributor canceled the contract after it read the email, and Bass was forced to negotiate with another distributor who only paid him a $45,000 advance.  Bass did not testify, however, regarding the overall Kill Speed profits, so this court could not determine if he otherwise recouped this "loss."  His testimony regarding his other losses were at best rounded estimates, and he again did not present any information regarding how he calculated these numbers. The court therefore will not award him any special damages.  Bass did establish, however, that this email caused him significant emotional distress and harmed his reputation within the industry.   He is entitled to compensation for the impact on his "professional standing, his good name and reputation, his injured feelings and his mental sufferings." *Alioto v. Cowles Commons, Inc.*, 430 F.Supp. 1363, 1371-72 (N.D.Cal. 1977), *aff'd*, 623 F.2d 616 (9th Cir. 1980).  This court therefore awards him $75,000 in compensatory damages.

22

**DECISION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Finally, this libel claim is non-dischargeable.  Tiscareno's willfully sent this email and its

2    attachments knowing that it would injure Bass, a professional screenwriter and director.  Tiscareno

3    disdained Bass and was envious of his success.  While Tiscareno still harbored his belief that Bass

4    had violated his FastGlass copyright, this email had nothing to do with his copyright claims against

5    Bass.  Tiscareno sent it out of spite, knowing that it would financially hurt Bass.  Tiscareno's

6    conduct was also malicious.  His publication of the two attachments was a wrongful act, done

7    intentionally, which was directed at Bass's professional reputation, which by definition necessarily

8    caused Bass harm.  As the *Sicroff* court noted, "A libelous act, by its nature, is self-evidently

9    wrongful and is committed by an intentional act of publication - - in this case, by Sicroff's

10   dissemination of his letter.  The third criterion - - that the action necessarily cause injury - - is also

11   met because Sicroff's statements were directed at Jett's professional reputation and, therefore, will

12   necessarily harm him in his occupation." *Sicroff*, 401 F.3d at 1106.  Finally, Tiscareno had no just

13   cause or excuse for his conduct.  While Tiscareno may have believed in his FastGlass copyright

14   claim, his email had nothing to do with this dispute.  He sent the email only to injure Bass, and not to

15   protest the alleged theft of his screenplay.[11]

16   **2.  The Demand Letters**

17    Tiscareno's April 25, 2012 and July 3, 2012 demand letters to Lionsgate and Netflix,

18   respectively, also constituted libel per se.  These letters called Bass a plagiarist and accused him of

19   stealing the FastGlass screenplay.  The letters also directly inferred that Bass had stolen the "Sister-

20   Sister" television concept from John Burt, and that Burt was paid substantial sums to settle his case.

21   Bass's testimony demonstrated that both statements were not true.

22    While Tiscareno's reference to Burt's claim does not directly state that Bass stole the "Sister-

23   Sister" idea, the letter's clear import is exactly that, and no extrinsic evidence is needed to deduce its

24   meaning.  This statement therefore qualifies as libel per se.

25    "If . . . a reader would perceive a defamatory meaning without extrinsic aid beyond
        his or her own intelligence and common sense, then . . . there is libel per se.  But if

26

27   _____

28   [11]  The *Sicroff* court also noted that it "may be rare to find a just cause and excuse for
     defamation."  401 F.3d at 1107, ft. 5.

                                          23

**DECISION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then . . . the libel cannot be libel per se . . . " *Barnes-Hind v. Superior Court* (19860 181 Cal.App.3d 377, 381.

Tiscareno sent these letters to two large movie distributors, and Bass testified that both Lionsgate and Netflix backed out of potential distribution deals for Kill Speed after receiving them. These letters contained provably false statements regarding Bass, their defamatory interpretations were clearly conveyed to their readers, and they both had a tendency to professionally injure Bass. Tiscareno libeled Bass by sending them.

Bass has not, however, demonstrated how he was financially harmed by this libel. While Bass did state that he lost distribution deals, he did not explain with any detail the amount of those losses. This court may still award him, however, compensatory damages for the injury to his professional reputation, injured feelings and mental distress. Weighing all of the circumstances in this case, the court awards Bass $25,000 in damages for these libelous letters.

This libel is also non-dischargeable under § 523(a)(6). While Tiscareno may still have harbored a belief that his FastGlass copyright was being violated, his statement that Bass had stolen the "Sister-Sister" idea had nothing to do with his copyright claim, and he included it for the sole purpose of injuring Bass. Tiscareno knew that calling Bass a thief would harm his reputation and standing in the film industry. His conduct was therefore "willful."

Tiscareno's conduct was also malicious. These letters constituted wrongful acts, done intentionally, directed at Bass's professional reputation, which necessarily caused Bass harm. Tiscareno also had no just cause or excuse for including the "Sister-Sister" allegation in his letter writing campaign. While Tiscareno may have believed in his FastGlass copyright claim, his statement that Bass had stolen the "Sister-Sister" concept had nothing to do with this dispute. He included this provision in his letters simply to injure Bass.

**3. The 2010 American Film Market Advertisements and filmtheft.com website and Video**

Tiscareno's video statements libeled Bass. When seen in context with the rest of the filmtheft.com contents, the date when the website first appeared on the net, and the fact that AFM attendees were encouraged to see the video, it takes little imagination or effort to conclude that

24

Tiscareno's video tirade against Kill Speed was directed against Bass (among others). Tiscareno intended to injure Bass's professional reputation in the film industry, and his video statements contained demonstrably false statements that Bass stole his screenplay. This too, was libel per se. Under all of the circumstances, this court awards Bass an additional $25,000 in general damages for the injury to his reputation and the mental distress that he endured.

This libel is also non-dischargeable under § 523(a)(6). Tiscareno's video statements were made public after he filed the 2010 Copyright Action. Tiscareno's allegations of theft and plagiarism should have been limited to his federal court pleadings, and if Tiscareno wanted to stop the film's distribution he should have filed for injunctive relief. The only reason why he participated in the filmtheft.com website and video, then, was to defame Bass and destroy his efforts to distribute Kill Speed. This was a conscious, willful act under § 523(a)(6).

This libel was also malicious. The picket signs, truck billboard information, filmtheft.com website and video were wrongful acts, done intentionally, directed at Bass's professional reputation, which necessarily harmed him.

### Conclusion

For the reasons stated above, Tiscareno's Chapter 7 discharge is denied, and a non-dischargeable judgment in favor of Bass for $125,000 shall be entered. Plaintiffs shall submit an appropriate judgment.

**\* \* \* END OF ORDER \* \* \***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

25

DECISION

# COURT SERVICE LIST

Tony Tiscareno
750 Treasure Drive
Bay Point, CA 94565

Other Recipient is an ECF participant

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

DECISION